Filed 12/29/22  P. v. Magana CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DIMAS MAGANA,<br><br>          Defendant and Appellant. | A164224<br><br>(San Mateo County<br> Super. Ct. No.<br> SC061828D) |

Dimas Magana was convicted of possession of ephedrine with intent to manufacture methamphetamine on a plea of no contest in 2006.  In 2021, he moved to vacate the conviction pursuant to Penal Code section 1473.7,[1] which permits individuals who are no longer in custody to move to vacate a conviction or sentence on the ground that it is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of" the plea.  (§ 1473.7, subd. (a)(1).)  He appeals from the denial of this motion.  We affirm.

---

[1]  Further statutory references will be to the Penal Code except as otherwise specified.

1

# BACKGROUND

## I.

### *The 2006 conviction*

According to the 2006 probation report, Magana and four codefendants were found in the "rear house" of a residence where police were executing a search warrant for evidence related to methamphetamine manufacture. In the same location, police found evidence related to an " 'extraction lab,' a process whereby pseudoephedrine is extracted from commercially available cold pills containing this substance, which is later used in the manufacturing of methamphetamine." The police found approximately 14.63 kilograms of pseudoephedrine pills (about 200,000), 880 grams of cocaine, 1.99 kilograms of methamphetamine and 350 grams of marijuana. Two loaded guns were located and $25,885 in cash was seized. A conversation between Magana and his wife revealed that he had $35,000 in cash hidden in a suitcase at his house, an amount the probation officer said could not be accounted for by Magana's salary. Magana claimed he was not involved and felt sorry for being at his codefendant's house. The probation officer stated, however, that the amount of controlled substances, loaded weapons and large amount of cash "clearly indicated [Magana] was in an environment of criminal sophistication and professionalism" and the toxic fumes in the lab "would have made any uninvolved person leave." One of the police officers reported that his throat began to burn due to chemical fumes in the lab.

Magana was charged with seven felonies: Unlawful possession of methamphetamine for sale (Health & Saf. Code, § 11378), with two alleged enhancements for weight (*id.,* § 11370.4, subd. (b)(1); § 1203.073, subd. (b)(2)) and an allegation that Magana was personally armed with a firearm (§ 120222, subd. (c)); unlawful possession of cocaine for sale (Health & Saf.

2

Code, § 11351), with alleged enhancements for weight (§ 1203.073, subd. (b)(1)) and arming (§ 12022, subd. (c)); possession of marijuana for sale (Health & Saf. Code, § 11359; possession of cocaine while armed with a loaded and operable firearm (*id.*, § 11370.1, subd. (a)); possession of methamphetamine while armed with a loaded operable firearm (*id.*, § 11370.1, subd. (a)); possession of ephedrine or pseudoephedrine with intent to manufacture methamphetamine (*id.*, § 11383, subd. (c)(1));[2] and unlawful manufacture of methamphetamine (*id.*, § 11379.6, subd, (a)), with an arming allegation (§ 12022, subd. (c)).

Pursuant to a plea agreement, Magana pleaded no contest to the count of possessing ephedrine with intent to manufacture methamphetamine in exchange for a two-year prison sentence and dismissal of the other charges. The plea form Magana signed, written in Spanish, stated, "Entiendo que si no soy ciudadano de los Estados Unidos, la condena por el delito del que se me acusa tendra como resultado que me deporten, y en que se me prohiba la entrada a los Estados Unidos, y me nieguen la naturalizacion." This advisement translates to: "I understand that if I am not a citizen of the

---

[2] When Magana entered his plea, Health and Safety Code section 11383 contained provisions related to possession with intent to manufacture methamphetamine (former Health & Saf. Code, § 11383, subds. (a), (c), (e)–(h)) and with intent to manufacture phencyclidine (*id.*, § 11383, subds. (b), (e)). (See Stats. 2003, ch. 619, § 1.) Subsequent to Magana's conviction, the statutes pertaining to possession with intent to manufacture methamphetamine and phencyclidine were reorganized. (Stats. 2006, ch. 646, Legis. Counsel's Dig.) Health and Safety Code section 11383 now pertains to possession with intent to manufacture phencyclidine while Health and Safety Code section 11383.5, added by the 2006 legislation (Stats. 2006, ch. 646, §§ 2, 3), pertains to possession with intent to manufacture methamphetamine.

References to Health and Safety Code section 11383 in this opinion are to the statute prior to the 2006 amendments.

3

United States, conviction of the crime with which I am charged will result in my deportation, and in my being barred from entering the United States and denied naturalization." (DeepL Translate <https://www.deepl.com/en/translator> [as of Dec. 28, 2022]; Google Translate <Translate.google.com> [as of Dec. 28, 2022] ["conviction . . . will result in my being deported, barred from entering the United States, and denied naturalization].)

The record does not include a reporter's transcript for the plea hearing. The minute order states that Magana was "advised of provisions of [section] 1016.5 [Penal Code] (Deportation)." Section 1016.5 requires a court, prior to accepting a plea of guilty or nolo contendere, to advise the defendant, "If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

Magana was subsequently sentenced to two years in prison, the lower term for his offense.

## II.

### *The Current Motion to Vacate*

On September 16, 2021, Magana filed a motion to withdraw his plea pursuant to section 1473.7, arguing that he entered the plea with the understanding that it "provided no immigration consequences" when in fact the conviction "causes serious immigration consequence[s] including removal." The motion emphasized the complexity of immigration law and stated that the Ninth Circuit did not clarify that a section 11383, subdivision (c)(1), conviction is categorically a drug trafficking aggravated

felony (8 U.S.C. § 1101(a)(43)(B)) until 2010, several years after Magana's plea.

Magana's declaration in support of his motion stated that at the time of his plea, he did not "meaningfully understand" that the conviction "could become a permanent removable offense years after" his plea; he did not receive detailed advice based on his "specific situation and background" about the potential immigration consequences of his case; "[o]ne of the determinative factors in the decision to accept or reject a plea offer was not having immigration consequences"; he would not have accepted the plea if he had known the conviction "could result in mandatory removal and denial of benefits for [his] entire life"; and "[t]he right to remain in the United States was more important to [him] than any additional potential jail sentence since there is a high likelihood that [he] will be in immigration detention while waiting for [his] removal proceedings in immigration court." Magana declared that he had "strong family, community ties, obligations, and opportunities" in the United States; at the time of his plea, he and his family "would have faced extreme hardship if [he] was forced to return to [his] country"; at that time, he had two "U.S. citizen children and gainful employment opportunities," had come to the United States in the "early 1980s" after his father was killed "by criminals" in Michoacan, Mexico, which was and remained a "very dangerous place," and he "would not have knowingly risked all that by pleading to a charge that had mandatory removal for life"; he had not had further trouble with the law; and "there was little to gain by accepting the plea offer, if [he is] forced to return to [his] country and spend years in immigration custody."

After a hearing at which counsel argued the motion but no additional evidence was presented, the trial court denied the motion. The trial court

5

ruled that Magana's factual showing was insufficient to meet his burden under section 1473.7. The court viewed Magana's declaration as largely conclusory, lacking facts to support his assertion that he was not properly advised of the immigration consequences of his plea facts regarding his immigration status, or contemporaneous evidence supporting his assertion that he would not have entered the plea if he had properly understood its consequences. The court was not persuaded by Magana's argument that his offense only became an aggravated felony as a result of the 2010 decision he cited, which the court read as reiterating what had been established law for years.

## DISCUSSION

### I.

### *Principles Governing a Section 1473.7 Motion to Vacate*

As the California Supreme Court has explained, "[w]hen long-standing noncitizen residents of this country are accused of committing a crime, the most devastating consequence may not be a prison sentence, but their removal and exclusion from the United States. (See *People v. Martinez* (2013) 57 Cal.4th 555, 563 (*Martinez*).) Because the prospect of deportation 'is an integral part,' and often even 'the most important part,' of a noncitizen defendant's calculus in responding to certain criminal charges (*Padilla v. Kentucky* (2010) 559 U.S. 356, 364 (*Padilla*)), both the Legislature and the courts have sought to ensure these defendants receive clear and accurate advice about the impact of criminal convictions on their immigration status, along with effective remedies when such advice is deficient. (E.g., Pen. Code, §§ 1016.2 et seq., 1473.7; *Jae Lee v. United States* (2017) [582] U.S. __ [137 S.Ct. 1958], 198 L.Ed.2d 476 (*Lee*); *Padilla*, at p. 360, 130 S.Ct.

1473; *Martinez*, at p. 559; *People v. Superior Court* (*Giron*) (1974) 11 Cal.3d 793, 798.)" (*People v. Vivar* (2021) 11 Cal.5th 510, 516 (*Vivar*).)

Section 1473.7, subdivision (a)(1), provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction" on the ground that it "is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." The moving party must also establish that "the conviction or sentence being challenged is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (*Id.*, subd. (e)(1).) If the moving party establishes grounds for relief by a preponderance of the evidence, the court "shall" grant the motion. (*Ibid.*) "When ruling on a motion under paragraph (1) of subdivision (a), the only finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (*Id.*, subd. (e)(4).)

"[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. (*Lee, supra,* [582] U.S. __ [137 S.Ct. at p. 1966].) Factors particularly relevant to this inquiry include the defendant's ties to the United

7

States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.  (See *id*. at p. __ [137 S.Ct. at pp. 1967-1969]; *Martinez, supra,* 57 Cal.4th at p. 568.)"  (*Vivar, supra,* 11 Cal.5th at pp. 529-530.)

"[M]ovants under section 1473.7 must provide evidence corroborating their assertions.  ' "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." ' (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 78, quoting [*Lee, supra,*] 582 U.S. ___, 137 S.Ct. 1958, 1967 [discussing how to evaluate the 'reasonable probability' that a defendant who would have rejected a plea deal but for counsel's erroneous advice about deportation in an ineffective assistance of counsel case].)"  (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 322 (*Rodriguez*); *Vivar, supra,* 11 Cal.5th at p. 530 ["when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence" ' "].)

"[A]ppeals from section 1473.7 hearings are subject to independent review.  (*Vivar, supra*, 11 Cal.5th 510, 525.)  Under this standard, ' "an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' (*Ibid.*)  Independent review extends particular deference to trial court findings 'that are based on " 'the credibility of witnesses the [superior court] heard and observed' " ' but not to findings drawn from the 'cold record' in the proceeding, since the trial and appellate courts are in the same position when tasked with interpreting such

materials.  (*Id.* at p. 527.)"  (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 755 (*Alatorre*).)

## II.

### *Relevant Federal Immigration Principles*

"The Immigration and Nationality Act (INA) renders deportable any alien convicted of an 'aggravated felony' after entering the United States. 8 U.S.C. § 1227(a)(2)(A)(iii).  Such an alien is also ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country.  See [8 U.S.C.] §§ 1229b(a)(3), (b)(1)(C).  Accordingly, removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here."  (*Sessions v. Dimaya* (2018) ___ U.S. ___ [138 S.Ct. 1204, 1210-1211].)

As relevant here, the term "aggravated felony" includes "illicit trafficking in a controlled substance (as defined in section 802 of Title 21 [of the United States Code]), including a drug trafficking crime (as defined in section 924(c) of Title 18 [of the United States Code])."  (8 U.S.C. § 1101(a)(43)(B).)  Section 924(c) of title 18 [of the United States Code] defines "drug trafficking crime" as "any felony punishable under the Controlled Substances Act (21 U.S.C. [§] 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. [§] 951 et seq.), or chapter 705 of title 46 [of the United States Code]."[3]  Possession of pseudoephedrine with intent to manufacture methamphetamine is an aggravated felony under federal law.  (*Lopez-Jacuinde v. Holder* (9th Cir. 2010) 600 F.3d 1215, 1216-1217 & fn. 3 (*Lopez-Jacuinde*).)  Specifically, this offense is "punishable as a

---

[3] Chapter 705 of title 46 of the United States Code is entitled "Maritime Drug Law Enforcement."

9

federal crime under 21 U.S.C. § 841(c), possession of a listed chemical with intent to manufacture a controlled substance." (*Id.* at p. 1217, fn. 3.)[4]

To decide whether a state conviction "qualifies as an 'aggravated felony' under the INA," federal courts "employ a 'categorical approach' to determine whether the state offense is comparable to an offense listed in the INA." (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 190.) "Under this approach we look 'not to the facts of the particular prior case,' but instead to whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding aggravated felony. (*Ibid.*) "[A] state offense is a categorical match with a generic federal offense only if a conviction of the state offense ' "necessarily" involved . . . facts equating to [the] generic [federal offense].' " (*Ibid.,* quoting *Shepard v. U.S.* (2005) 544 U.S. 13, 24 (plur. opn.).) " 'The prior conviction qualifies as [the generic offense] only if the statute's elements are the same as, or narrower than, those of the generic offense.' " (*U.S. v. Alvarado-Pineda* (9th Cir. 2014) 774 F.3d 1198, 1202, quoting *Descamps v. U.S.* (2013) 570 U.S. 254, 257.)

## III.

### *Analysis*

#### A. Magana Failed to Demonstrate an Error Prejudicing His Ability to Understand the Immigration Consequences of His Plea.

#### 1. *Magana's Offense Was an Aggravated Felony.*

Magana's main argument on appeal is that the trial court ignored his inability to understand that his conviction was an aggravated felony under federal law. He contends his inability to understand was corroborated by the

---

[4] Both ephedrine and pseudoephedrine are "listed chemical[s]" (21 U.S.C. §§ 802(33), 802(34)(C), 802(34)(K)), and methamphetamine is a controlled substance (21 U.S.C. §§ 802(6), 812(c), Schedule II(c) & Schedule III(a)(3)).

fact that federal courts "did not address the issues" until after his plea, when the Ninth Circuit, in 2010, "clarified" that a conviction under section Health and Safety Code section 11383, subdivision (c)(1), is categorically a drug trafficking aggravated felony under title 8 of the United States Code (8 U.S.C.) section 1101(a)(43)(B). (*Lopez-Jacuinde, supra,* 600 F.3d 1215.) At the time of his plea in 2006, Magana maintains, not every California drug offense was a categorical match for a federal drug trafficking crime because California statutes criminalized a broader range of activity and greater variety of substances than did federal law, and no published decision indicated that a conviction under Health and Safety Code section 11383, subdivision (c)(1), was a drug trafficking aggravated felony.

The defendant in *Lopez-Jacuinde,* like Magana, was convicted of violating section 11383, subdivision (c)(1), in that case by possession of pseudoephedrine with intent to manufacture methamphetamine. (*Lopez-Jacuinde, supra,* 600 F.3d at p. 1216.) The Board of Immigration Appeals held the conviction was a drug trafficking crime constituting an aggravated felony under 8 U.S.C. section 1101(a)(43)(B). On appeal, the defendant argued the conviction was not a drug trafficking aggravated felony because the state offense was broader than the corresponding federal one, positing that the federal offense required use of a firearm and possession of a minimum amount of pseudoephedrine, neither of which were required for the state offense. (*Lopez-Jacuinde,* at p. 1216.)

As indicated above, 8 U.S.C. section 1101(a)(43)(B), defines as an aggravated felony "illicit trafficking in a controlled substance (as defined in section 802 of Title 21 [of the United States Code]), including a drug trafficking crime (as defined in section 924(c) of Title 18 [of the United States Code])." *Lopez-Jacuinde* explained that the Ninth Circuit had interpreted

11

this provision as "providing two analytic routes through which a state drug felony may be classified as an aggravated felony:  (1) if the state crime contains a 'trafficking element,' it is an aggravated felony under the 'illicit trafficking in a controlled substance' prong of § 1101(a)(43)(B); or (2) if the state offense would be punishable as a felony under federal drug laws, it is an aggravated felony under the 'including a drug trafficking crime' prong of that section." (*Lopez-Jacuinde, supra,* 600 F.3d at p. 1217.)  With regard to the second prong, the defendant in *Lopez-Jacuinde* argued that "drug trafficking crime" as defined in the federal statutes included use of a firearm as an element.  (*Id.* at pp. 1217-1218.)  Disagreeing with the defendant's reading of the statutory text, the Ninth Circuit held that "use of a firearm is not a necessary element of a 'drug trafficking crime' for the purpose of determining whether an alien has been convicted of an 'aggravated felony.' " (*Id.* at p. 1218.)  The court similarly rejected the defendant's argument that the federal definition required possession of a minimum amount of pseudoephedrine, an argument the court described as attempting "to incorporate federal regulatory provisions requiring that retail distributors keep records of high-quantity pseudoephedrine transactions into separate federal provisions criminalizing possession of pseudoephedrine with intent to manufacture methamphetamine." (*Id.* at pp. 1218-1219.)

Like the trial court, we do not read *Lopez-Jacuinde* as having changed the law after Magana's plea to make possession of ephedrine with intent to manufacture methamphetamine an aggravated felony when it previously had not been considered one.  Rather, the Ninth Circuit rejected arguments that the federal offense included elements beyond those required by the statutory definitions.  The court did not suggest there was any question whether the statutory elements of the California offense of possession of pseudoephedrine

with intent to manufacture methamphetamine in violation of Health and Safety Code section 11383, subdivision (c)(1), were broader than those of the federal drug trafficking aggravated felony as defined in 8 U.S.C. section 1101(a)(43)(B), section 924(c) of title 18 of the United State Code, and section 841(c) of title 21 of the United States Code. Nor does Magana suggest how that might be the case. *Lopez-Jacuinde* provides no reason to think possession of ephedrine with intent to manufacture methamphetamine was not an aggravated offense under the INA in 2006. Then, as now, the statutory language made clear that possession of ephedrine with intent to manufacture methamphetamine was a felony under the Controlled Substances Act and, therefore, an aggravated felony.[5]

---

[5] In 2006, as now, "aggravated felony" included "a drug trafficking crime (as defined in section 924(c) of Title 18 [of the United States Code])" (8 U.S.C. § 1101(a)(43)(B)); a "drug trafficking crime" under section 924(c)(2) of title 18 [of the United States Code] included "any felony punishable under the Controlled Substances Act (21 U.S.C. [§] 801 et seq.)"; the Controlled Substances Act made it unlawful to "knowingly or intentionally . . . possess[] a listed chemical with intent to manufacture a controlled substance" (21 U.S.C. § 841(c)(1)); ephedrine was a "listed chemical" (21 U.S.C. §§ 802(33), 802(34(C)); and methamphetamine was a controlled substance (21 U.S.C. §§ 802(6), 812(c), Schedule II(c) & Schedule III(a)(3)).

That ephedrine is not itself a controlled substance, as Magana's counsel emphasized at oral argument (although not in his briefs), is immaterial: Possession of ephedrine with intent to manufacture methamphetamine is an aggravated felony as a drug trafficking crime because it is a felony punishable under the Controlled Substances Act regardless of whether it would also be an aggravated felony under the " 'illicit trafficking in a controlled substance' prong" of the definition. (*Daas v. Holder* (9th Cir. 2010) 620 F.3d 1050, 1054, quoting *Lopez-Jacuinde, supra,* 600 F.3d at p. 1217.)

13

## 2. *Magana Did Not Prove He Was Not Advised of the Immigration Consequences of His Plea.*

Magana maintains the trial court rejected his assertion that he was not advised of the adverse immigration consequences of his plea because he signed the plea form stating he would have immigration consequences. He argues that although the plea form stated his conviction "will" have immigration consequences, nothing in the record demonstrates he meaningfully understood and knowingly accepted the mandatory immigration consequences of his plea and "there was no mention during the plea colloquy of immigration consequences and no representations by defense counsel that they had provided such advisements." There are a number of problems with this argument.

First, the record does not support Magana's description of the plea hearing. The record on appeal does not include a transcript of the 2006 plea hearing; the only record of what was said at the hearing is the court's minute order. The minute order states that Magana was "advised of provisions of [section] 1016.5 [Penal Code] (deportation)," contradicting Magana's argument that there was "no mention . . . of immigration consequences" at the plea hearing. Absent a reporter's transcript of the hearing or declaration from the attorney who represented Magana at the time, we have no evidence of what counsel represented at the hearing regarding advisements to Magana about immigration consequences. Counsel did, however, sign the statement on the plea form saying he had "personally read and explained the contents of the above declaration to the defendant." The "above declaration," of course, includes the statement that the conviction "will" result in Magana being deported, barred from entering the United States and denied naturalization. Magana "has the burden of providing an adequate record" and "[f]ailure to provide an adequate record on an issue requires that the issue be resolved

against [him]." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; see *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.)

Second, Magana's emphasis on the advisement in the plea form is misplaced. Magana argues the trial court erred in concluding the "generic advisement regarding potential immigration consequences of the plea satisfied section 1473.7." He relies on cases holding that "the words 'may have' in a section 1016.5 immigration advisement are not an adequate immigration advisement for defendants charged with serious controlled substance offenses. (*People v. Patterson* [(2017)] 2 Cal.5th [885,] 889, 895.) Defendants must be advised that they *will be* deported, excluded, and denied naturalization as a *mandatory* consequence of the conviction. (*Ibid.*) 'A defendant entering a guilty plea may be aware that some criminal convictions may have immigration consequences as a general matter, and yet be unaware that a conviction for a specific charged offense will render the defendant subject to mandatory removal.' (*Ibid.*)" (*People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1065.) These principles are of little use to Magana because, as he recognizes in other parts of his briefs, his plea form stated that his conviction "will" result in deportation, exclusion and denial of naturalization, not that these consequences "may" result.[6]

Third, the record does not support Magana's assertion that the trial court rejected his claim of lack of advice *because* he signed the plea form. The trial court noted at the outset of the hearing that the People's opposition incorrectly stated Magana had been advised his plea "*may* have immigration

---

[6] Magana's briefs are completely inconsistent in describing the advisement on the plea form, stating both that the plea form indicated "there will be immigration consequences" and that he was advised only that the adverse immigration consequences "may" result.

consequences" when in fact the plea form stated the plea "*would* have consequences of deportation, exclusion from admission to the United States, and denial of naturalization." (Italics added.) But the court made no reference to this point in its ruling; it denied the motion, the court stated, because it found the record "deficient in its facts to support granting the relief" Magana sought.

The court addressed several specific deficiencies in explaining its ruling, emphasizing that Magana's declaration mainly consisted of conclusory statements with "very little facts" in support. The court first discussed the absence of evidence that counsel failed to advise Magana of the immigration consequences of his plea, which the court regarded as the major factor addressed in *Vivar* and *Ruiz*. The court also disagreed with Magana's claim that *Lopez-Jacuinde* changed immigration law and therefore indicated possession of ephedrine with intent to manufacture methamphetamine was not an aggravated felony at the time of Magana's plea. It found Magana's declaration insufficient to establish that his conviction was causing, or had the potential to cause, removal or other adverse immigration consequences (§ 1473.7, subd. (e),[7] and it found there was no contemporaneous evidence to

___

[7] The trial court found there was no evidence, in Magana's declaration or otherwise, of his immigration status at the time of the plea or currently, and saw Magana as asking the court to "infer things because he's filed a motion under this provision." Although none of Magana's arguments on appeal directly address this aspect of the trial court's ruling, he suggests the court ignored "uncontradicted evidence" in the record showing he is a noncitizen who moved to the United States in the 1980s and at the time of his plea was in the process of obtaining his permanent resident visa. He points to the probation report as stating these facts.

Although the probation report is part of the record on appeal, and thus available to us in reviewing the trial court's order, it appears that Magana did not present the probation report to the trial court in connection with his

16

demonstrate Magana would not have entered the plea if he had been properly advised of its immigration consequences. The advisement on the plea form simply does not appear to have played a significant role in the trial court's analysis.

The trial court focused on the absence of evidence that Magana was misadvised despite its recognition that Magana's motion did not depend on proof he received ineffective assistance of counsel. (§ 1473.7, subd. (a)(1).) The advice given (or not given) by counsel is relevant even though, as Magana emphasizes, "[p]rejudicial error" for purposes of section 1473.7 may result from "the moving party's *own* mistake of law or inability to understand the potential adverse immigration consequences of the plea." (*People v. Jung* (2020) 59 Cal.App.5th 842, 856, overruled on other grounds in *Vivar*, *supra*, 11 Cal.5th at p. 526, fn. 4; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1009.) A defendant's assertion of his or her error or lack of understanding must be corroborated by contemporaneous evidence (*Vivar,* at p. 530; *Rodriguez, supra,* 68 Cal.App.5th at p. 322), and evidence that counsel did not fully explain the immigration consequences of a plea would corroborate a defendant's claim that he or she was not advised and therefore did not understand the consequences.

The trial court rejected Magana's assertion that he was not advised of the adverse immigration consequences of his plea because it found no

_____

motion: The court stated that it had before it only Magana's moving papers and declaration (which attached copies of two children's birth certificates and Magana's criminal record) and the People's opposition (which attached the 2006 plea form and minute order from the plea hearing). The trial court could not "ignore" evidence that was not presented to it.

In any event, our analysis of this case does not turn on the trial court's finding that Magana failed to establish his lack of citizenship.

evidence to corroborate the assertion. Magana declared that he "did not meaningfully understand that this conviction could become a permanent removable offense years after my plea" and that he "did not receive detailed, affirmative and meaningful advice based on [his] specific situation and background regarding the potential immigration consequences of [his] criminal case." His declaration—the only evidence he submitted in support of the motion—provided no information about the circumstances and content of his discussions with counsel—such as what he told or asked counsel, what counsel said or did not say, how much time counsel spent with him—or otherwise elaborate upon his conclusory statement. We agree with the trial court that the "conclusory and generic" statements in Magana's declaration are insufficient to establish that he was not advised of the immigration consequences of his plea.

In *Vivar, supra,* 11 Cal.5th 510, for example, the defendant rejected a potentially immigration-neutral plea offer because he mistakenly believed it could not be immigration neutral, and accepted an offer to plead to an offense he mistakenly believed would avoid deportation; his attorney did not correct his erroneous assumptions and did not advise him on the actual immigration consequences of the plea. (*Id.* at pp. 518-519.) Detailed facts concerning the defendant's understanding, the plea offers and counsel's advice were described by the defendant and, while his plea attorney declined to provide a declaration, her recollection was presented to the court in unsworn emails and handwritten notes from the plea negotiations. (*Ibid.*) In *Rodriguez, supra,* 68 Cal.App.5th 301, the defendant's declaration described the circumstances under which she entered her plea and stated that she was never advised the offense to which she pleaded no contest was an aggravated felony and would have the consequence of permanently separating her from

18

her family. (*Id.* at pp. 316-317.) In addition, the supervising attorney for the public defender's office at the time of the plea declared that the defendant's attorney's extensive file notes gave no indication the attorney ever examined the immigration consequences of the plea or advised the defendant about them. (*Id.* at p. 317.) The declaration further stated that at that time—five years before *Padilla, supra,* 559 U.S. 356, held that an attorney's failure to advise a client of the potential immigration consequences of pleading guilty to a criminal charge constitutes ineffective assistance of counsel—" 'it was not the common practice of defense counsel to research or advise clients regarding the specific immigration consequences of a particular plea.' " (*Rodriguez,* at p. 317.)

The present record reflects no such corroboration of Magana's statement that he was not properly advised. Magana signed the plea form stating he understood his plea "will result in my deportation, and in my being barred from entering the United States and denied naturalization," and he "presented no independent evidence that he was told anything other than that he would be deported." (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 664.) His conclusory assertion that he did not "meaningfully understand" his conviction "could become a permanent removable offense years after [his] plea and become disastrous from an immigration law perspective" does not demonstrate, as section 1473.7 requires, that his " '*ability* to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea' was damaged by an error. (Italics added.)" (*Abdelsalam,* at p. 664.)

Finally, while a defendant's own subjective error can qualify for relief under section 1473.7, there must be "evidence show[ing] he or she misunderstood the immigration consequences of a plea deal." (*Alatorre,*

*supra,* 70 Cal.App.5th at p. 769.)  *Alatorre* provides an example.  (*Id.* at p. 770.)  The *Alatorre* court explained, "there can be little doubt in this case that Alatorre never appreciated his plea and subsequent conviction made him *automatically* deportable" because "it was Alatorre's misguided efforts to become a naturalized citizen within three years of his conviction that brought him to the attention of immigration authorities and triggered his own deportation.  It goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country.  This alone demonstrates it is more likely than not that Alatorre failed to 'meaningfully understand' the consequences of his plea." (*Ibid.*)

Magana argues that the record does not demonstrate he meaningfully understood and knowingly accepted the mandatory immigration consequences of his plea, but this misunderstands his burden:  Magana was required to show he did *not* understand and knowingly accept the consequences.  "Defendant was required . . . to show that one or more" errors "were prejudicial and damaged his 'ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of [his] plea . . . .' (§ 1473.7, subd. (a)(1).)" (*People v. Camacho*, *supra,* 32 Cal.App.5th at p. 1009.)  As we have said, a defendant's uncorroborated assertions are not sufficient.

### B.  **Magana Failed to Demonstrate Prejudice.**

Having concluded that Magana failed to meet his burden of demonstrating an error that damaged his ability to meaningfully understand, defend against or knowingly accept the adverse immigration consequences of his plea, we do not necessarily need to address the prejudice prong of the

section 1473.7 analysis. It is worth observing, however, that Magana failed to substantiate his claims in this respect as well.

Magana argues he demonstrated a reasonable probability he would not have entered his plea if he had understood it would subject him to permanent deportation by his declaration stating he had strong family and community ties to the United States and he and his family would have faced "extreme hardship" if forced to return to Mexico. As he correctly observes, a number of cases discuss evidence of a defendant's strong ties to the United States as corroborating post hoc assertions that the defendant would not have entered the plea if he or she had understood its immigration consequences. (E.g., *Alatorre, supra,* 70 Cal.App.5th at pp. 752, 771 [defendant came to United States as preschooler; wife and children were United States citizens; parents, siblings and large extended family lived here; after deportation, defendant remained close to border to see children on weekends]; *Rodriguez, supra,* 68 Cal.App.5th at p. 316 [defendant had been in United States since she was one year old; mother was citizen, father was lawful resident pending naturalization, sisters lived here; defendant was in committed relationship, had two children and was pregnant with third]; *Vivar, supra,* 11 Cal.5th at pp. 516-517, 530 [defendant had been in the United States for 40 years, since age six; mother, wife, children and grandchildren were all citizens; at the time he was deported, wife was undergoing radiation treatment for medical condition and son was about to be deployed to the Middle East with United States Air Force].)

Here, Magana declared: "I have strong family, community ties, obligations, and opportunities in the United States and at the time of my plea, me and my family would have faced extreme hardship if I was forced to return to my country"; "I had two U .S. citizen children and gainful

21

employment opportunities" at the time of the plea;[8] "I came to the United States in the early 1980s after my father was killed by criminals in Michoacan, Mexico," which "was and is still a very dangerous place," and "I would not have knowingly risked all that by pleading to a charge that had mandatory removal for life." Magana provided contemporaneous evidence that he had two children born in the United States by attaching the birth certificates to his declaration, and the trial court accepted that having two United States citizen children was "significant in [Magana's] life at the time that he entered this plea." Beyond that, however, his statements about his ties to the United States were, as the trial court said, generic and conclusory.[9]

The same is true of the assertions in Magana's declaration about the significance of immigration consequences to him at the time he entered his plea. Magana did not elaborate on or provide evidence supporting his statements that "[o]ne of the determinative factors in the decision to accept or reject a plea offer was not having immigration consequences; that "I would not have accepted the plea if I knew that this conviction could result in mandatory removal and denial of benefits for my entire life"; that "[t]he right to remain in the United States was more important to me than any additional potential jail sentence since there is a high likelihood I will be in

---

[8] At the hearing, when the trial court stated that Magana had not presented evidence—even in his declaration—of the "gainful employment" his attorney cited in discussing his ties to the United States, counsel conceded the declaration did not address Magana's employment and suggested it was "reasonable to assume" he had been working for many years.

[9] Magana provided independent evidence to support his assertion that he had not committed further offenses by submitting a copy of his criminal record, but this point was not relevant to his understanding of the consequences of his plea at the time he entered it.

immigration detention while waiting for my removal proceedings in immigration court; and that "[t]here was little to gain by accepting the plea offer, if I'm forced to return to my country and spend years in immigration custody." By contrast, for example, the defendant in *Lee, supra,* 582 U.S. __ [137 S.Ct. at pages 1967-1968], repeatedly asked his attorney whether there was any risk of deportation; both he and the attorney testified that Lee would have gone to trial if he had known about the deportation consequences of his plea; and at the plea hearing, when the judge warned that the conviction could result in deportation and asked if this affected Lee's decision whether to plead guilty, Lee said "yes" and entered the plea only after his attorney assured him the judge's statement was "a 'standard warning.'" Magana provided no such corroborating evidence.

Nor did Magana address what he would have done in lieu of accepting the plea offer. He said nothing about any potential defense he would have asserted if he chosen to go to trial. Presumably, the strength or weakness of available defenses would have been a consideration in deciding whether to plead no contest.[10] According to the probation report, Magana claimed he

---

[10] "A defendant without any viable defense . . . will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial" because the defendant "will be highly likely to lose at trial" and therefore "highly likely" to "accept a plea." (*Lee, supra,* 582 U.S. __ [137 S.Ct. at p. 1966].) *Lee* explained that such a defendant might rationally reject a plea offer if "the respective consequences of a conviction after trial and by plea . . . are, from the defendant's perspective, similarly dire"; if avoiding deportation is the critical factor and the plea will certainly lead to deportation, a trial that will "*almost* certainly" have the same result may seem preferable. (*Id.* at pp. 1966, 1968-1969.) Unlike the defendant in *Lee,* as we have said, Magana did not present any evidence to corroborate his after-the-fact statements about the significance he attached to immigration consequences at the time of his plea.

was "not involved at all" and felt "sorry for being at [codefendant's] house." His defense at trial, however, surely would have been seriously undermined by the evidence that he was present in an " 'extraction lab,' " with large quantities of methamphetamine and other controlled substances, loaded firearms, stacks of cash and chemical fumes that caused a police officer's throat to burn and, in the words of the probation officer, "would have made any uninvolved person leave," and that he had $35,000 in cash hidden at his home that "his salary would not account for."

If convicted at trial, Magana would have faced a potential sentence considerably longer than the two-year low term he received under the plea agreement. The middle and upper terms for possession of ephedrine with intent to manufacture methamphetamine, the charge to which Magana pleaded no contest, are (and were in 2006) four and six years. (Health & Saf. Code, § 11383; Stats. 2003, ch. 619, § 1.) Three of the counts dismissed pursuant to the plea agreement alleged that Magana was armed with a firearm; if found true, this enhancement would add 16 months, two years or three years to the sentence for the substantive offenses,[11] which themselves carried sentences ranging from a low of three years for possession for sale of cocaine to a high of seven years for manufacture of methamphetamine. Sentences for the other dismissed counts ranged from 16 months (low term for possession of marijuana for sale) to four years (upper term for possession of cocaine or methamphetamine while armed with a loaded and operable

---

[11] In 2006, section 12022 provided for punishment by "imprisonment in the state prison" (see Stats. 2010, ch. 711, § 5), which section 18 defined as a sentence of 16 months, two years or three years. (See Stats. 2011, ch. 15, § 230.)

24

firearm).[12] And conviction on any of four counts in addition to the one to which Magana pleaded would have subjected Magana to the same immigration consequences as his plea, as the three possession for sale offenses, as well as the count of manufacture of methamphetamine, are also aggravated felonies under the 8 U.S.C. section 1101(43)(B).[13]

---

[12] Manufacture of methamphetamine is and was in 2006 punishable by imprisonment for three, five or seven years (Health & Saf. Code, § 11379.6, subd. (a); see Stats. 2003, ch. 620, § 1); the firearm enhancement would add three, four or five years (§ 12022, subd. (c); see Stats. 2010, ch. 711, § 5), for a maximum of 12 years and minimum of 6 years.

Possession of methamphetamine for sale is (and was in 2006) punishable by a term of 16 months, two years or three years (Health & Saf. Code, § 11378; § 1170, subd. (h)(1)); Stats. 2001, ch. 841, § 6), plus three years for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (b)(1); Stats. 1998, ch. 425, § 1) and three, four or five years for the firearm enhancement (§ 12022, subd. (c); see Stats. 2010, ch.711, § 5), for a maximum of 11 years and minimum of 7 years and 4 months.

Possession of cocaine for sale is and was punishable by imprisonment for two, three or four years (Health & Saf. Code, § 11351; Stats. 2000, ch. 8, § 4), plus three, four or five years for the firearm enhancement (§ 12022, subd. (c); see Stats. 2010, ch.711, § 5), for a maximum of 9 years and minimum of 5 years.

Possession of cocaine or methamphetamine while armed with a loaded and operable firearm is and was punishable by a term of two, three or four years. (Health & Saf. Code, § 11370.1, subd. (a); see Stats. 1996, ch. 1132, § 1.)

Possession of marijuana for sale, in 2006, was punishable by imprisonment for 16 months, two years or three years. (Former Health & Saf. Code, § 11359 ["imprisonment in the state prison"]; Stats. 1976, ch. 1139, § 73; § 18; see Stats. 2011, ch. 15, § 230.)

[13] Possession of methamphetamine for sale under Health and Safety Code section 11378 is an aggravated felony (*U.S. v. Rodriguez-Gamboa* (9th Cir.) 972 F.3d 1148, 1150; *U.S. v. Verduzco-Rangel* (9th Cir. 2018) 884 F.3d 918, 923), as is possession for sale of cocaine under Health and Safety Code section 11351 (*Robles Lopez v. Sessions* (9th Cir. 2018) 901 F.3d 1071, 1075

As to the possibility of a plea bargain less detrimental from an immigration standpoint, Magana's declaration says nothing about the plea negotiations or any other basis for concluding he had "reason to believe an immigration-neutral disposition was possible." (*Vivar, supra,* 11 Cal.5th at pp. 529-530.) As five of the seven charged offenses were drug-trafficking aggravated felonies under the INA, an immigration neutral disposition would have been possible only if the prosecutor agreed to dismiss all these charges and allow Magana to plead to an offense without an element relating to sale or manufacture of a controlled substance. (See *Rendon v. Mukasey, supra,* 520 F.3d at p. 976 [possession of controlled substance with intent to sell is an aggravated felony because it contains a trafficking element].) Magana's declaration offers no reason to think the prosecutor would have accepted a plea agreement permitting him to avoid all offenses implicating sale or manufacture of a controlled substance when the circumstances of the offenses so clearly involved such conduct.

Magana acknowledges the requirement that "movants under section 1473.7 must provide evidence corroborating their assertions," but he does not appear to appreciate how little he offered as " 'contemporaneous evidence to substantiate [his] expressed preferences.' " (*People v. Ogunmowo, supra,* 23 Cal.App.5th at p. 78, quoting *Lee, supra,* 582 U.S. __ [137 S.Ct. at p. 1967].) His conclusory and mostly uncorroborated declaration is

---

[cocaine salt]; see *Rendon v. Mukasey* (9th Cir. 2008) 520 F.3d 967, 976 [possession of controlled substance with intent to sell is an aggravated felony because it contains a trafficking element]), possession for sale of marijuana under Health and Safety Code section 11359 (*Roman-Suaste v. Holder* (9th Cir. 2014) 766 F.3d 1035, 1037), and manufacturing methamphetamine under section 11379.6 (*Boone* v. *Ashcroft* (9th Cir. 2004) 113 Fed. Appx. 749, 750).

insufficient to show a reasonable probability that he would not have entered his plea if he had understood it would make him subject to mandatory deportation and permanent exclusion.[14]

## DISPOSITION

The order denying Magana's section 1473.7 motion is affirmed.

---

[14] Magana's opening brief includes an argument that his unawareness of the immigration consequences of his plea supports vacating the plea under section 1018. Under section 1018, "[a]t any time before judgment, or within six months after an order granting probation if entry of judgment is suspended, a trial court may permit a defendant to withdraw a guilty plea for 'good cause shown.' (§ 1018.)" (*Patterson, supra,* 2 Cal.5th at p. 894.)

Magana does not explain how his claim of mistake and failure to understand, insufficiently corroborated for purposes of section 1473.7, would be sufficient for purposes of section 1018. His assertion that his ability to meaningfully understand and accept the immigration consequences of his plea "cannot be presumed based on a standard advisement that merely described the possibility of removal as something that may happen as a consequence of the plea" ignores the fact that he was advised the plea "will" have these consequences.

In any event, Magana made clear in the trial court that his motion was *not* based on section 1018, telling the court "this is not a motion under [section] 1018." We will not address this argument further.

_____

STEWART, P.J.

We concur.


_____

RICHMAN, J.



_____

VAN AKEN, J. [*]


*People v. Magana* (A164224)

[*] Judge of the San Francisco Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.